ALLIANCE DEFENSE FUND
BENJAMIN W. BULL
Arizona State Bar No. 009940
GARY S. McCALEB (admitted *pro hac vice*)
Arizona State Bar No. 018848
15100 North 90th Street
Scottsdale, AZ 85260
Phone: (480) 444-0020; Fax: (480) 444-0028

ALLIANCE DEFENSE FUND
TIMOTHY D. CHANDLER
California State Bar No. 234325
101 Parkshore Dr., Suite 100
Folsom, CA  95630
Phone: (916) 932-2850; Fax: (916) 932-2851

LAW OFFICES OF TERRY L. THOMPSON
TERRY L. THOMPSON
California State Bar No. 199870
P.O. Box 1346
Alamo, CA 94507
Phone: (925) 855-1507; Fax: (925) 820-6034
(designated local counsel)

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAITH CENTER CHURCH EVANGELISTIC MINISTRIES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL D. GLOVER, et al., <br><br> Defendants. | CASE NO. C-04-3111 JSW <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; POINTS AND AUTHORITIES IN SUPPORT** <br><br> **Hearing Date: Friday, November 7, 2008** <br> **Hearing Time: 9:00 a.m.** |

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iv

Notice of Motion and Motion ..........................................................................................1

Statement of Relief Requested .........................................................................................1

Memorandum of Points and Authorities ...........................................................................1

Introduction ......................................................................................................................1

Issue to be Decided ..........................................................................................................1

Statement of Relevant Facts .............................................................................................2

Summary of Argument .....................................................................................................7

Argument ..........................................................................................................................8

I.   There are no genuine issues of material fact and Faith Center is entitled to judgment as a matter of law ...........................................................................................................8

II.  The County's ban on "religious services" violates Faith Center's free speech rights .............9

    A.   The Ninth Circuit's preliminary injunction decision narrowed the County's Religious Use Policy to prohibit only "pure religious worship." .........................................................9

    B.   The County is engaging in viewpoint discrimination by prohibiting Faith Center's meeting, which addressed topics that are otherwise permitted in the forum ....................10

    C.   The County continues to ban all "religious services," in violation of the Ninth Circuit's preliminary injunction ruling ....................................................................................13

    D.   The Religious Use Policy is also subject to strict scrutiny as a content-based restriction in a designated public forum ..............................................................................14

        1.   The Antioch Library's policies and practices reveal its intent to "generally open" the meeting room for expressive activity, not limit it to only specific groups or topics ....15

            a.   The Meeting Room Policy's stated purpose is to open the meeting room for any group to discuss any topic—but exclude religious services ....................16

            b.   The Library grants permission to use the meeting room "as a matter of course" ..16

            c.   The fee requirement does not restrict access to the forum, it merely reflects the County's preferred use of the meeting room .......................................17

    d.   The Antioch Library allows its meeting room to be used as a classroom, proving that the Policy's restriction on school use is not intended to limit the nature of the forum...........................................................................................18

    e.   The Antioch Library has not consistently enforced its meeting room use policies ...................................................................................................................18

   2.  The nature of the forum is compatible with a wide array of expression.....................19

E.  The Religious Use Policy cannot survive strict scrutiny. ...................................20

III. The County cannot limit access to a forum in a manner that violates the Free Exercise Clause ............................................................................................................................21

IV. The Religious Use Policy violates the Establishment Clause....................................22

A.  The Religious Use Policy is impermissibly hostile toward religion.................................23

B.  The Religious Use Policy impermissibly distinguishes among religions.........................23

V.  The Religious Use Policy violates Faith Center's right to equal protection..........................24

Conclusion ...........................................................................................................................25

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*American Family Assn., Inc. v. City and County of San Francisco,*
    277 F.3d 1114 (9th Cir. 2002) ...............................................................8, 23

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................8

*Arkansas Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998) .................................................................................16

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ...................................................................24

*Bronx Household of Faith v. Bd. of Educ. of the City of New York,*
    331 F.3d 342 (2d. Cir. 2003).....................................................................12

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993).........................................................................8, 21, 22

*Colorado Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ...............................................................24

*Cornelius v. NAACP Legal Defense and Educ. Fund,*
    473 U.S. 788 (1985).................................................................................16

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
    196 F.3d 958, 965 (9th Cir. 1999) .......................................................15, 17

*Employment Div., Dept. of Human Resources of Or. v. Smith,*
    494 U.S. 872, 879 (1990).......................................................................21, 22

*Fairfax Covenant Church v. Fairfax County Sch. Bd.,*
    17 F.3d 703 (4th Cir. 1994) .....................................................................22

*Faith Center Church Evangelistic Ministries v. Glover,*
    2005 WL 1220947 (N.D. Cal. 2005) .......................................................21

*Faith Center Church Evangelistic Ministries v. Glover,*
    480 F.3d 891 (9th Cir. 2006) ............................................................ *passim*

*Faulkner v. Jones,*
    51 F.3d 440 (4th Cir. 1995) .....................................................................25

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953).................................................................................8, 25

*Good News Club v. Milford Central Sch.,*
    533 U.S. 98 (2001)..................................................................8, 11, 12, 21, 23

*Hopper v. City of Pasco,*

241 F.3d 1067 (9th Cir. 2001) ........................................................8, 14, 15, 19

*Kreisner v. City of San Diego,*
    1 F.3d 775 (9th Cir. 1993) ...................................................................23

*Larson v. Valente,*
    456 U.S. 228 (1982)........................................................................22, 23

*Perry Educ. Assn. v. Perry Local Educators Assn.,*
    460 U.S. 37 (1983)................................................................................14

*Plyler v. Doe,*
    457 U.S. 202 (1982)..............................................................................25

*Rosenberger v. Rector and Visitors of the Univ. of Virginia,*
    515 U.S. 819 (1995)................................................................................9

*San Jose Christian Coll. v. Morgan Hill,*
    360 F.3d 1024, 1031 (9th Cir. 2004) ...................................................21

*Serrano v. Francis,*
    345 F.3d 1071 (9th Cir. 2003) .............................................................24

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 620 (1994)..............................................................................20

*Vernon v. City of Los Angeles,*
    27 F.3d 1385 (9th Cir. 1994) ...............................................................23

*Widmar v. Vincent,*
    454 U.S. 263 (1981).................................................................14, 16, 21

## **Other Authorities**

42 U.S.C. § 1988 .........................................................................................1

Fed.R.Civ.P. 56...........................................................................................1, 8

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 7, 2008 at 9:00 a.m. in Courtroom 2 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, Plaintiffs Faith Center Church Evangelistic Ministries and Pastor Hattie Mae Hopkins ("Faith Center") will move this Court for summary judgment against the Defendants (the "County") on each of their causes of action. This Motion is brought under Federal Rule of Civil Procedure 56, and the grounds for this Motion are set forth in the Memorandum of Points and Authorities below and in the Amended Verified Complaint.

## STATEMENT OF RELIEF REQUESTED

Faith Center respectfully requests this Court (1) declare that the "Religious Use" provision of the Contra Costa County Library Policy for the Use of Meeting Rooms in Libraries ("Religious Use Policy") violates the First and Fourteenth Amendments to the U.S. Constitution both on its face and as applied to Faith Center; (2) permanently enjoin the County from enforcing its Religious Use Policy; (3) award Faith Center nominal damages; and (4) declare Faith Center the prevailing party for purposes of 42 U.S.C. § 1988.

## MEMORANDUM OF POINTS AND AUTHORITIES
### INTRODUCTION

This is a simple case of religious discrimination. The Constitution prohibits the government from imposing special burdens on the basis of religion. As a result, the County may limit access to a forum only in religion-neutral terms. It cannot prohibit speech or conduct that is religiously-motivated, while allowing the same speech or conduct when it is not religiously-motivated. Yet that is precisely what the County is doing. As such, Faith Center is entitled to summary judgment.

### ISSUE TO BE DECIDED

The Contra Costa County Library Meeting Room Policy intentionally opens library meeting rooms generally for community use, but its "Religious Use" provision forbids using the rooms for all "religious services." Does the "Religious Use" provision, both on its face and as applied, violate the First and Fourteen Amendments to the U.S. Constitution?

# STATEMENT OF RELEVANT FACTS

**Contra Costa County's Library Meeting Room Use Policy**

The County's Meeting Room Policy broadly opened its library meeting rooms for community use. *See* Ex. T to Chandler Decl. Specifically, the meeting rooms are available to "non-profit and civic organizations, for-profit organizations, schools and governmental organizations." *Id.* The County "encourage[s] the use of library meeting rooms for educational, cultural, and community related meetings, programs, and activities," but does not limit the rooms to such uses. Even groups like the Ku Klux Klan (KKK) and the North American Man-Boy Love Association (NAMBLA) are free to use the meeting rooms. Ex. A to Chandler Decl., at 38-39.

The policy contains only two narrow exceptions to an otherwise open forum. It prohibits meeting rooms from being used for "religious services." Ex. T to Chandler Decl. And it prohibits schools from using meeting rooms "for instruction purposes as a regular part of the curriculum." *Id.* The County also imposes some administrative requirements. Applicants must "fully complete an application form for each use." *Id.* And any use that is closed to the public, charges an admission fee, or involves soliciting or selling, is charged a fee. *Id.*

The County has expressly discriminated against religious speech in its Religious Use Policy since at least 1992. The 1992 policy stated that "[l]ibrary meeting rooms shall not be used for religious purposes." *See* Amended Verified Complaint ("Compl."), Ex. C. It was revised in 1993 to prohibit "religious services or activities." *Id.* at Ex. E. The current Religious Use Policy was adopted in 2004, shortly after this lawsuit was filed.

**The Antioch Public Library**

The County's Meeting Room Policy applies to the library branch in Antioch, California. The Antioch Library building contains a single, large meeting room that has a capacity of 110 people. Ex. W to Chandler Decl. The meeting room is located in the southeast corner of the building, adjacent to the lobby of the building, as well as the staff's work area, kitchen, and restroom. Ex. R to Chandler Decl. The book stacks and reading areas are in the northwest corner of the building, away from the meeting room on the other side of the staff's work area. *Id.*

1    The Antioch Library is open from 10 a.m. to 8 p.m. on Monday through Wednesday, 12

2    p.m. to 8 p.m. on Thursday, 12 p.m. to 6 p.m. on Friday, 10 a.m. to 6 p.m. on Saturday, and is

3    closed on Sunday. *See* Ex. U to Chandler Decl. But the meeting room is available seven days a

4    week. *See* Ex. W to Chandler Decl. Users can reserve it as early as they want in the mornings,

5    and can stay until 10 p.m. on any night. *See id.*, Ex. B to Chandler Decl., at 18-19. The rules

6    limit users to one reservation per week and to eight hours per day, but these provisions are not

7    regularly enforced. *See* Ex. W to Chandler Decl.; Chandler Decl. at ¶¶ 120-21.

8         The meeting room is available for a variety of uses. Food and beverages are permitted,

9    and users may play music and show movies. *See* Ex. B to Chandler Decl., at 18-19. When the

10   library is open, users are asked to limit their volume so that it cannot be heard outside of the

11   meeting room. The sound restrictions are lifted, however, when the library is closed and the staff

12   is not present. *Id.* at 19-20.

13   **Faith Center Background**

14        Pastor Hopkins is the leader of Faith Center. Hopkins Decl. at ¶ 1. She holds religious

15   meetings in non-traditional buildings because she believes that many people who would benefit

16   from Christianity are reluctant to go to a traditional church building. *Id.* at ¶ 3. These meetings

17   include a time of "praise and worship," which involves discussions about the Bible, sermons,

18   singing, praying, testimonies, taking communion, and discussions of social issues. *Id.* at ¶ 4.

19        Pastor Hopkins' sermons take principles of living from the Bible and help listeners apply

20   those principles to their lives. *Id.* at ¶ 5. She covers topics like: developing strong character;

21   developing good self-esteem by understanding how God sees us; overcoming addictions and

22   harmful habits; learning to forgive; knowing how to have a good relationship with God and

23   others; having patience; learning to rely on God to provide for all of our needs; dealing with

24   rejection; overcoming fear, anxiety, and depression; and other similar topics. *Id.*

25   **Faith Center's May 29, 2004 Event at the Antioch Library**

26        In May 2004, Pastor Hopkins applied to use the meeting room on May 29 and July 31,

27   2004. Compl. at ¶ 39. A librarian requested separate applications for each date, and Pastor

28   Hopkins complied. *Id.* at ¶¶ 40-41.  She later confirmed with two Library officials over the

phone that her requested meeting dates were on the Library's calendar. *Id.* at ¶ 42.

Faith Center's May 29, 2004 event was entitled the "Women of Excellence Conference." Hopkins Decl. at ¶ 8. It was divided into four parts: registration, a Wordshop, refreshments, and a time of "praise and worship" with a sermon. *Id.* The topic of the Wordshop was "The Making of an Intercessor." *Id.* at ¶ 9. Using lessons from the Bible, the Wordshop explained the need for all Christians to pray, and to provide instruction on how to pray fervent, effectual prayers that God hears and answers. *Id.*

The Wordshop training in "how" to pray was then put into practice during the afternoon "praise and worship" session. The session opened in prayer, modeling the Wordshop's training about effective communication. *Id.* at ¶ 10. The prayer also acknowledged personal and community struggles affecting the group, communicating to them that they are not alone in overcoming those struggles. *Id.* The group then sang "When I See Jesus," chosen to reinforce the Wordshop's lesson that a strong relationship with Jesus, developed through prayer, provides hope, encouragement, and strength, particularly in difficult times. *Id.* at ¶¶ 11-12. Then a guest performer sang "Amazing Grace," also chosen to reinforce a key lesson from the Wordshop: that regardless of the mistakes someone has made in the past, anyone can effectively communicate with God because of His grace and forgiveness. *Id.* at ¶¶ 13-14.

Pastor Hopkins then preached a sermon, "Position Yourself for Victory," based on 2 Chronicles 20. *Id.* at ¶ 15. Building on the Wordshop, Pastor Hopkins used the Bible to show how prayer and developing good moral character can help anyone overcome the problems they encounter. *Id.* at ¶ 16. The session concluded with prayer. Like the opening prayer, it modeled the Wordshop's training and acknowledged the group's struggles. *Id.* at ¶ 17. It also encouraged the group to apply the principles they had learned even after the conference was over. *Id.*

Near the end of the conference, a library assistant in the staff room overheard Faith Center's meeting. *See* Ex. D to Chandler Decl., at 14-15. She and another assistant informed Pastor Hopkins that the meeting room could not be used for religious activities, and gave her a copy of the then-current meeting room policy. Compl. at ¶¶ 52, 55. They told Pastor Hopkins that a library volunteer had mistakenly put Faith Center on the calendar, and its July 31 event

would be removed. *Id.* at ¶ 59. Pastor Hopkins later spoke with Defendant Laura O'Donahue, who confirmed that Faith Center's July 31 event was taken off the calendar and that Faith Center would not be allowed in the meeting room. *Id.* at ¶¶ 65-69. Pastor Hopkins tried to resolve the matter with the County, including sending the Library a letter with legal analysis from counsel, but was unsuccessful. *Id.* at ¶¶ 70-78.

**Broad use of the Antioch Library meeting room**

Between January 2003 and March 2008, the Antioch Library received over 1,200 applications to use its meeting room from approximately 120 different groups. Chandler Decl. at ¶ 10. Apart from Faith Center, only twelve were denied, eleven because of scheduling conflicts. *Id.* at ¶ 11. The other, an application from the Mensa Genius Society, does not specify why it was not approved.[1] The approved applications included a broad array of groups, including:

**Political:** The Sierra Club met for a letter-writing campaign. The Contra Costa County Democratic Control Committee held public candidate interviews. The East Contra Costa County Democratic Club held meetings for the public to learn about candidates and issues. And the Antioch RV and Boat Club held a public meeting on property rights. *Id.* at ¶¶ 14-23.

**Educational:** An Antioch High School teacher used the meeting room to help the school's Academic Decathlon and Mock Trial teams prepare for competitions. South University used the meeting room for English and math testing. A+ Educational Center tutored students at the Library, and Mini Math Camp taught kids better math skills. East County Providers Network held its pre-school graduation ceremony in the meeting room. And several individual students used the room for study groups and projects. *Id.* at ¶¶ 34-50.

**Financial:** Groups like Merrill Lynch, Senior Wealth Management, and Windsor Mortgage Capital Corp. have conducted seminars on financial planning and home-buying. AARP Tax Aide and Contra Costa County Tax-Aide have offered tax assistance. *Id.* at ¶¶51-57.

**Community Improvement/Animal Rescue:** Citizens for a Better Antioch met many times for citizen awareness meetings. Neighborhood Watch hosted community meetings with the

---

[1] It is likely that Mensa was denied only *free* access to the meeting room. *Id.* A note on the application indicates that Mensa charged a $12 fee to attend the meeting, and the Meeting Room Policy requires events that charge admission to pay a rental fee. *See* Ex. T to Chander Decl.

local police. Animal rescue groups held board meetings and volunteer orientations. And Sons of Italy, a local social and charitable group, regularly conducts its business meetings in the meeting room. *Id.* at ¶¶ 63-68, 107-08.

**Theater/Music:** K/P Entertainment was approved to conduct auditions for "American Idol." Larkay Production used the meeting room on several occasions to conduct acting classes. And Order My Life Productions auditioned actors and held rehearsals for a gospel stage play. The play included songs, so the auditions and rehearsals had singing. Actors were invited to bring a CD player to their audition. *Id.* at ¶¶ 69-71.

**Youth Sports:** Several youth sports organizations met for a variety of purposes, including youth sign-ups, board meetings, CPR/first aid training, coaching courses, cheer uniform fitting, scorekeepers' clinics, and management interviews. *Id.* at ¶¶ 72-75.

**Youth Development:** The Boy Scouts, Cub Scouts, Girl Scouts, and Brownies, met for general meetings, leaders meetings, Order of the Arrow Meetings, Mock Eagle Board, award ceremonies, CPR training, etc. The Boy Scouts' meetings are intended for "character building in youth," and the Cub Scouts' to "promote[] citizenship and growth for boys." The Center for Human Development held youth programs to prevent youth alcohol and drug abuse. And other groups held 4-H meetings at the Library. *Id.* at ¶¶ 76-81.

**Government:** Contra Costa County used the meeting room for an election. The County Children and Family Services presented informational meetings on foster care. The Coast Guard and the County Public Works Department each held seminars on boating safety. The state Department of Rehabilitation used the meeting room for a team-building session. And the U.S. Postal Service conducted several meetings at the Library to help prepare members of the community for entry-level employment at the post office. *Id.* at ¶¶ 82-88.

**Union:** Two unions, SEIU UHW-West and the United Health Care Workers, conducted their membership meetings at the Library. *Id.* at ¶¶ 89-90.

**Legal:** The American Family Legal Center conducted several living trust seminars at the Library. The Contra Costa County Bar Association used the meeting room to provide immigration services. Hanna & Brophy, a law firm, used the meeting room to conduct

depositions. And Sildorf, Shinnick & Ryan, another law firm, used the Library to hold a meeting to discuss a class action lawsuit. *Id.* at ¶¶ 58-62.

**Religious:** Both Narcotics Anonymous and Alcoholics Anonymous met to help people overcome drug and alcohol addiction. *Id.* at ¶¶ 30, 32. These meetings included religious components: both use a twelve-step program that involve being "willing to accept God to relieve you of your addiction," "asking God to remove your defects," and "tak[ing] constant spiritual inventory." *See* Ex. F to Chandler Decl., at 20-22. And N.A. meetings open and close in prayer. *Id.* at 20-21. The Glorious Communications Network met for a Bible study and to "build people of integrity." Chandler Decl. at ¶ 29. And Know Thyself as Soul Foundation held meditation seminars that teach the Sant Mat Lifestyle in the hopes that we "become true human beings, to know our self as soul, and to realize our oneness with the Creator." *Id.* at ¶ 26; Ex. I to Chandler Decl. The Antioch Library permitted these groups to use the meeting room even though the then-current Religious Use Policy prohibited either all meetings with "a religious purpose," or all "religious activities" and "religious services. *See* Exs. C and E to Compl.

**Library-sponsored events:** The Library has sponsored a wide array of youth events, including a hot dog and ice cream social, presentations involving live animals (including pigs), and events that involve clowns and singers. *See* Ex. V to Chandler Decl; Ex. F to Chandler Decl., at 9; Ex. D to Chandler Decl., at 9-11.

## SUMMARY OF ARGUMENT

The County has made its library meeting rooms generally available to the community for a wide array of activities. Its Religious Use Policy, however, expressly prohibits "religious services." Faith Center requested to use a meeting room for a religious meeting that included a time of "praise and worship" involving prayer, singing, and a sermon. The County contends that such a meeting is barred under its policy.

In its preliminary injunction decision, the Ninth Circuit narrowed the County's policy to prohibit only "pure religious worship," finding that such a policy would not violate the Free Speech Clause in a limited public forum. *Faith Center Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 915 (9th Cir. 2006). This holding, however, does not resolve Faith Center's

constitutional claims. As the record shows, Faith's Center's prohibited meeting was not "pure religious worship," but presented religious perspectives on topics that are permitted in the forum. Thus, by excluding Faith Center from the forum, the County is engaging in viewpoint discrimination. *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001).

The County's policy is unconstitutional for several other reasons. First, by granting access to its meeting rooms as a matter of course for a broad array of expression, the County has created a designated public forum. As a content-based restriction, the ban on "religious services" is therefore subject to strict scrutiny. *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001).

Moreover, the County's policy bars religiously-motivated activities from its meeting rooms, while allowing identical activities solely because they are not religiously-motivated. Under the Free Exercise Clause, this type of restriction is subject to strict scrutiny, regardless of the type of forum involved. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993). The Religious Use Policy is also impermissibly hostile toward religion, in violation of the Establishment Clause, because it excludes religious activity from a forum otherwise available to all. *American Family Assn., Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1120-21 (9th Cir. 2002). And it imposes a special burden on a class of religious groups that is not imposed on similarly-situated meeting room users, thus violating the Equal Protection Clause. *Fowler v. Rhode Island*, 345 U.S. 67 (1953).

The County cannot articulate a compelling interest that justifies its facially discriminatory policy. As such, Faith Center is entitled to judgment as a matter of law on each of its claims.

## ARGUMENT

**I.     There are no genuine issues of material fact and Faith Center is entitled to judgment as a matter of law.**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c). While all inferences are made in favor of the non-moving party, an issue of fact is genuine only if there is enough evidence on both sides so that a reasonable trier of fact could resolve the issue either way. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). There are no genuine

1    issues of material fact here. Faith Center is entitled to judgment on each of its claims.

2    **II.    The County's ban on "religious services" violates Faith Center's free speech rights.**

3        Faith Center's afternoon session—which the County says violates its Religious Use

4    Policy[2]—is constitutionally-protected expression: "Faith Center engaged in protected speech when

5    its participants met in the Antioch Library for prayer, praise, and worship." *Faith Center*, 480 F.3d at

6    906 (citing multiple Supreme Court decisions). And, although the Ninth Circuit partially overturned

7    Faith Center's preliminary injunction, the fully-developed record before this Court proves that Faith

8    Center's prohibited afternoon session addressed permissible topics from a religious perspective. As

9    such, the Religious Use Policy is viewpoint-based and subject to strict scrutiny review. *Rosenberger*

10   *v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 (1995).

11   **A.    The Ninth Circuit's preliminary injunction decision narrowed the County's Religious**
12   **Use Policy to prohibit only "pure religious worship."**

13       The Free Speech Clause, according to the Ninth Circuit, allows the government to exclude

14   "pure religious worship" from a limited public forum. *Faith Center*, 480 F.3d at 915. "Pure religious

15   worship" is worship that does not "convey[] a religious viewpoint on otherwise permissible subject

16   matter." *Id.* Worship addressing a permissible subject matter, on the other hand, must be allowed in

17   the forum. *See id.* at 916 (distinguishing "pure religious worship" from "an evangelical service of

18   worship, combining teaching with elements of worship") (quotation marks and citation omitted).

19       "Pure religious worship" is thus an extremely narrow category of speech—one that the Ninth

20   Circuit concedes rarely (if ever) exists: "It is difficult to imagine, however, that religious worship

21   could ever truly be divorced from moral instruction or character development." *Id.* at 915 n.14. If

22   applied any more broadly, the County's Religious Use Policy would unconstitutionally discriminate

23   based on viewpoint by prohibiting speech addressing otherwise permissible topics from a religious

24   perspective. *Id.* at 914-15.

---

[2] The County initially informed Faith Center that its entire May 29, 2004 meeting violated its
former Religious Use Policy. But it has since conceded that its former policy was
unconstitutional and that Faith Center's morning Wordshop session is the type of religious
speech permitted under the current Religious Use Policy. The Library contends, however, that it
may constitutionally bar Faith Center's afternoon "praise and worship" session. *Faith Center*,
480 F.3d at 904.

**B.    The Count is engaging in viewpoint discrimination by prohibiting Faith Center's meeting, which addressed topics that are otherwise permitted in the forum.**

The Ninth Circuit's analysis in the preliminary injunction appeal was limited by a record devoid of any substantive descriptions of Faith Center's meeting. But that is no longer the case, as the record before this Court includes a detailed description of the meeting, *see* Hopkins Decl. at ¶¶ 8-17, which shows that the meeting addressed at least three distinct topics that the Antioch Library permits in its meeting room: becoming an effective communicator, developing good moral character, and overcoming personal and societal struggles.[3]

Faith Center's May 29, 2004 meeting was entitled the "Women of Excellence Conference." Hopkins Decl. at ¶ 8. The morning session was a "Wordshop," which used the Bible to explain the importance of prayer, and provided lessons on how to effectively communicate with God through prayer. *Id.* at ¶ 9. To this, the Library does not object.

The afternoon session—to which the Library *does* object—consisted of five elements: an opening and closing prayer, two songs, and a sermon. The prayers modeled and reinforced the Wordshop's lessons about effectively communicating with God, and encouraged the attendants to continue applying those lessons after the meeting was over. *Id.* at ¶¶ 10, 17. The prayers also provided the group a chance to collectively acknowledge personal and community struggles affecting those in attendance, and to look for ways to overcome those problems. *Id.* Praying in this way communicates to others that they are not alone in trying to overcome whatever problems they are faced with. *Id.* at ¶ 10.

Pastor Hopkins intentionally selected the two songs, "When I See Jesus" and "Amazing Grace," to teach two key lessons: (1) that a strong relationship with Jesus developed through prayer provides the hope and strength needed to overcome difficult problems; and (2) regardless

---

[3] Groups that discussed effective communication include the Antioch High School Mock Trial team and the Antioch Lion's Club, which used the meeting room multiple times for speaker contests. *See* Chandler Decl. at ¶¶ 55, 93. Groups that discussed developing good moral character include the Boy Scouts and Cub Scouts. *Id.* at ¶¶ 76, 77. And groups that discussed overcoming personal struggles include Alcoholics Anonymous and Narcotics Anonymous. *Id.* at 31, 33.

of one's past mistakes, it is always possible to effectively communicate with God through prayers because of God's grace and unconditional forgiveness. *Id.* at ¶¶ 11-14.

And Pastor Hopkins' sermon, "Position Yourself for Victory," used the Bible to teach that anyone can help overcome the problems in our society if they develop the right moral character and learn to effectively pray. *Id.* at ¶ 16. Pastor Hopkins specifically designed her sermon to build upon the lessons taught in the morning Wordshop. *Id.*

This case is therefore no different than *Good News Club*, where a school district opened its facilities for social, civic, recreational, and entertainment events. 533 U.S. at 103. When a Good News Club wanted to meet after school to sing, pray, and teach the Bible—the same elements in Faith Center's afternoon session—the school rejected the request. In the school's view, the club's activities "were not a discussion of secular subjects . . . from a religious perspective, but were in fact the equivalent of religious instruction itself." *Id.* at 104 (quotation marks and citation omitted). The Supreme Court correctly rejected that excuse and held that the school unconstitutionally discriminated against the club's religious viewpoint. *Id.* at 112.

Justice Souter dissented, urging that the club "intend[ed] to use the public school premises not for the mere discussion of a subject from a particular, Christian point of view, but for an <u>evangelical service of worship</u> . . . ." *Id.* at 138 (Souter, J., dissenting; emphasis added). Worship services, he claimed, fell outside the scope of the school's limited forum and therefore were properly excluded—even if the school must allow other religious speech. *Id.* at 139 n.3.

The majority disagreed: "According to Justice Souter, the Club's activities constitute 'an evangelical service of worship.' Regardless of the label Justice Souter wishes to use, what matters is the substance of the Club's activities." *Id.* at 112 n.4 (citation omitted). And the substance of those activities, the Court concluded, "do[es] not constitute mere religious worship, divorced from any teaching of moral values." *Id.* Rather, "the Club chooses to teach moral lessons from a Christian perspective through live storytelling and prayer." *Id.* at 110. Thus, although the meetings included elements of "religious worship," they nonetheless "address[ed] a subject otherwise permitted under the rule . . . from a religious standpoint." *Id.* at 109.

Just as the Good News Club used prayer, singing, and Biblical instruction to teach morals and character development from a religious perspective, *see id.* at 110-11, Faith Center uses those same methods to teach effective communication, character development, and personal and community improvement—all topics permitted in the Antioch Library meeting room. Indeed, the Ninth Circuit explained that the Antioch Library <u>must</u> permit activities such as "discussing the Bible and other religious books as well as teaching, praying, singing, sharing testimonies, sharing meals, and discussing social and political issues" because they "convey a religious perspective on subjects that are or have been permitted in the Antioch Library meeting room." *Faith Center*, 480 F.3d at 914.

Faith Center's meeting is also indistinguishable from the religious activities in *Bronx Household of Faith v. Board of Education of the City of New York*, 331 F.3d 342 (2d. Cir. 2003). There, a church asked to use a school building for weekly worship services that included singing hymns, prayer, Biblical preaching and teaching, communion, sharing testimonies, and social fellowship. *Id.* at 347. The school denied the request, citing its policy prohibiting "religious services or religious instruction." *Id.* at 348. The Second Circuit held in the church's favor, concluding that the worship services were indistinguishable from the *Good News Club* activities:

> We find no principled basis upon which to distinguish the activities set out by the Supreme Court in *Good News Club* from the activities that the [church] has proposed for its Sunday meetings. . . . Like the Good News Club meetings, the Sunday morning meetings of the church combine preaching and teaching with such "quintessentially religious" elements as prayer, the singing of Christian songs, and communion. . . . On these facts, it cannot be said that the meetings of Bronx Household of Faith constitute only religious worship, separate and apart from any teaching of moral values.

*Id.* at 354 (citing *Good News Club*, 533 U.S. at 112 n.4).

This Court should hold likewise. The evidence before it about Faith Center's meetings— which was not before the Ninth Circuit—proves that Faith Center's afternoon session was not "pure religious worship," separate and apart from any teaching about permissible topics from a religious perspective.

//
//

**C. The County continues to ban all "religious services," in violation of the Ninth Circuit's preliminary injunction ruling.**

Despite *Good News Club* and the Ninth Circuit's preliminary injunction decision in this case, the County continues to ban all "religious services" from its library meeting rooms. Of course, not all religious services consist of "pure religious worship." The County would unquestionably be required to allow the religious services in *Good News Club* and *Bronx Household of Faith* in its meeting rooms. But the County is not making this distinction.[4]

The County does not define "religious services" in any of its policies. *See* Ex. C to Chandler Decl., at 10. Both the County's senior librarian, Anne Cain, and the County's deputy librarian who oversees the Antioch library, admit that they do not know how to define the term. *See* Ex. A to Chandler Decl., at 40; Ex. C to Chandler Decl., at 12.[5] And the County has apparently not given its employees any instruction or guidance on what constitutes a religious service. *See* Ex. C to Chandler Decl., at 10. After the Ninth Circuit issued its decision on the preliminary injunction, Ms. Cain instructed the county libraries to "revert to the policy of prohibiting religious services in the library meeting rooms," without ever mentioning the Ninth Circuit limiting the ban to "pure religious worship." *See* Ex. S to Chandler Decl. Ms. Cain confirmed this in her deposition, explaining that if "somebody said they were having a religious service there [in a library meeting room], we would not allow it." *See* Ex. A to Chandler Decl., at 59.

As a result, the Antioch Library is enforcing the Religious Use Policy more broadly than the Ninth Circuit allows. For example, Greta Galindo, the supervising librarian at the Antioch library, explained in her deposition that the Religious Use Policy would prohibit "a sermon on what the

---

[4] Faith Center contends that even if the Meeting Room Policy applies only to "pure religious worship" in a limited public forum, it would still be unconstitutional under *Good News Club*, despite the Ninth Circuit's holding to the contrary. Faith Center further contends that such a policy would violate the Free Exercise, Establishment, and Equal Protection Clauses, and would be unconstitutional if this Court concludes that the meeting room is a designated public forum. Those claims are discussed below.

[5] This is particularly notable because Ms. Cain proposed the current Religious Use Policy to the Library's Board of Supervisors and recommended that they adopt it. *See* Ex. A to Chandler Decl., at 12-13.

Bible says about how to manage your money," *see* Ex. B to Chandler Decl., at 11, even though

money management is a common topic permitted in the meeting room. *See* Chandler Decl. at ¶¶ 52-

56.[6] This is blatant viewpoint discrimination. At a bare minimum, the County should therefore be

enjoined to bring their policy, and its enforcement, in line with the Ninth Circuit's preliminary

injunction ruling.[7]

**D.    The Religious Use Policy is also subject to strict scrutiny as a content-based restriction in a designated public forum.**

Even if this Court finds that the County's ban on Faith Center's afternoon session is not

viewpoint-based, strict scrutiny still applies. The Antioch Library meeting room is a designated

public forum, where even content-based regulations—like the Religious Use Policy—are subject

to strict scrutiny. *Perry Educ. Assn. v. Perry Local Educators Assn.*, 460 U.S. 37, 46 (1983).

Public property is classified as one of three types of forum. Property that has

immemorially been used for expressive activity, such as a park or a sidewalk, is a traditional

public forum. *Id.* at 45. Property that is open "for use by the public as a place for expressive

activity" is a designated public forum. *Id.* In either, content-based restrictions are subject to strict

scrutiny. *Id.* at 46. Property not fitting into either of these two categories is a non-public forum.

Speech restrictions in a non-public forum must be reasonable and viewpoint-neutral. *Id.*

This Circuit also recognizes a fourth category, the limited public forum, which is

property that is "intentionally opened to certain groups or to certain topics." *Hopper*, 241 F.3d  at

1074 (quotation marks and citation omitted). Speech restrictions in a limited public forum are

subject to the same standards as those in a non-public forum. *Id.* at 1075.

---

[6] Two County library assistants agreed with Ms. Galindo and said that the Religious Use Policy prohibits groups from having a sermon in a meeting room. *See* Ex. D to Chandler Decl., at 20; Ex. F to Chandler Decl., at 25-26.

[7] Compounding the problem is the fact that the County is excessively entangling itself with religion when its librarians decide whether an applicant is conducting a prohibited "religious service." *See Widmar v. Vincent*, 454 U.S. 263, 269 n.6 (1981) ("Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases."); *see also Faith Center*, 480 F.3d at 918.

"[G]overnment intent is the essential question" in distinguishing between a designated public forum and a limited public forum. *Id.* Intent is determined by "the nature of the property and its compatibility with expressive activity, as well as the policy and practices of the government." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999) (citation omitted). The less restrictive the criteria for admission and the less administrative control over access, the more likely a forum will be deemed a designated public forum. *Hopper*, 241 F.3d at 1075. A designated public forum is characterized by broad categories of speech allowed in the forum where access is granted as a matter of course. *Id.* at 1076. On the other hand, a limited public forum is generally open only for specific topics or speakers, or involves a selective process in gaining access to the forum. *Id.*, *see also DiLoreto*, 196 F.3d at 967.

Based on the scant record before it,[8] the Ninth Circuit held that the Antioch Library meeting room is a limited public forum. *Faith Center*, 480 F.3d at 908. But, as shown below, the developed record before this Court more fully depicts the County's policy and practices, revealing its intent to open the meeting room as a designated public forum.

**1.**     ***The Antioch Library's policies and practices reveal its intent to "generally open" the meeting room for expressive activity, not limit it to only specific groups or topics.***

After initially emphasizing that the County's stated purpose for its Meeting Room Policy is very broad, *Faith Center*, 480 F.3d at 908, the Ninth Circuit settled on the meeting room being a limited public forum due to three factors: (1) users must first submit an application form and pay a fee for certain uses; (2) the Policy's prohibition on school's using the meeting room "for instructional purposes as a regular part of the curriculum;" and (3) the lack of any evidence that the Antioch Library had failed to consistently enforce its policies. *Id.* at 909. But the full record before this Court paints a much different picture.

//

//

---

[8] The only relevant evidence before the Ninth Circuit was the Meeting Room Policy, and applications from Faith Center and three other groups (Sierra Club, Narcotics Anonymous, and East Contra Costa County Democratic Club) to use the Antioch Library meeting room. *Faith Center*, 480 F.3d at 908-09.

a.    *The Meeting Room Policy's stated purpose is to open the meeting room for any group to discuss any topic—but exclude religious services.*

The Antioch Library meeting room is open to every conceivable type of organization: "[n]on-profit and civic organizations, for-profit organization, schools, and governmental organizations" are all welcome to use the meeting room. *See* Ex. T to Chandler Decl. As the Ninth Circuit noted, "the County's purpose was to invite the community at large to participate in use of the meeting room for expressive activity." *Faith Center*, 480 F.3d at 908. And apart from its ban on "religious services," the County does not restrict the topics groups may discuss in any way. *See* Ex. A to Chandler Decl., at 37. The County "encourage[s] the use of the library meeting rooms for educational, cultural and community related meetings, programs, and activities," but it does not limit access to only those uses.[9] *See* Ex. T to Chandler Decl.

b.    *The Library grants permission to use the meeting room "as a matter of course."*

Virtually every government facility open for public use requires users to first submit an application for approval, if nothing more than to ensure the facility is available to maintain its orderly function. An application process, by itself, is therefore not determinative of the nature of a forum. Rather, the key inquiry is whether the application process is merely ministerial and permission is granted as a matter of course, or if the government requires individualized, non-ministerial judgments about who is permitted to use the forum. *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 804 (1985); *Perry Educ. Assn.*, 460 U.S. at 47.

In *Widmar v. Vincent*, for example, a university opened a designated public forum for student groups by adopting a policy that made its meeting rooms "generally open" to such groups, even though they were required to get permission first. 454 U.S. 263, 265, 267 (1981). By contrast, in *Arkansas Educational Television Commission v. Forbes*, the government did not open a designated public forum, because it only gave political candidates "selective access" to a televised debate; each candidate was scrutinized and individually screened based on their public perception, financial support, and public interest level. 523 U.S. 666, 679-82 (1998).

---

[9] For example, the Library has permitted a law firm to hold depositions in the meeting room. *See* Chandler Decl. at ¶ 62.

The Antioch Library grants access to its meeting room as a matter of course. From January 2003 to March 2008, it received over 1,200 applications from over 120 different groups. Chandler Decl. at ¶ 10. Less than one percent were denied, and eleven were denied simply because the room was unavailable. *Id.* at ¶ 11. Apart from Faith Center, not one application was denied because of the meeting's content or because the meeting fell outside the purpose of the forum.[10] *Id.* Nor could the library officials, when deposed, recall an example of the Library denying a request to use the meeting room because of the requested event's content. *See* Ex. B to Chandler Decl., at 8; Ex. C to Chandler Decl., at 8.[11] Thus, as in *Widmar*, the Antioch Library has made its meeting room "generally open" to the community, granting permission to applicants as a matter of course. This evidence—which was not before the Ninth Circuit—shows the County intended to create a designated public forum. *Forbes*, 523 U.S. at 678-680.

c.      *The fee requirement does not restrict access to the forum, it merely reflects the County's preferred use of the meeting room.*

In its analysis, the Ninth Circuit briefly mentioned the County's fee requirement for meetings that are closed to the public, charge an admission fee, or involve solicitation or selling, noting that this suggests a "desire to limit access to the library meeting room for certain purposes and speakers." *Faith Center*, 480 F.3d at 909. But the fee requirement does not limit access to the forum in any way. The Meeting Room Policy says that the County's policy is to "encourage" certain uses of its meeting rooms, *see* Ex. T to Chandler Decl., and the fee requirement is a way to implement that preference without restricting the community's access to the forum. The forum is still available to any group that wants to discuss any topic, except for "pure religious worship."

In some instances, a fee requirement reflects the government's intent to merely raise funds, not create a forum for public expression. *See, e.g., DiLoreto*, 196 F.3d at 966. But this is not one of those instances. The County's fee requirement has been imposed on less than one

---

[10] One additional application, from the Mensa Genius Society, was also denied without a reason clearly specified. *Id*.

[11] The only specific examples any library official could recall involved either a scheduling conflict or an applicant who was unwilling to pay a rental fee to use the meeting room. *See* Ex. E to Chandler Decl., at 16-18.

percent of the Antioch Library meeting room applications. *See* Chandler Decl. at ¶ 12. Combined with its broadly stated purpose for opening the meeting rooms, the County's rare collection of fees can only logically be interpreted as showing an intent to open a forum for public expression.

d.     *The Antioch Library allows its meeting room to be used as a classroom, proving that the Policy's restriction on school use is not intended to limit the nature of the forum.*

The Ninth Circuit also noted that the Meeting Room Policy prohibits schools from using the meeting room "for instructional purposes as a regular part of the curriculum." *Faith Center*, 480 F.3d at 909. This provision is necessary, the Ninth Circuit explained, to avoid converting the meeting room into a classroom. *Id.* at 910. But there is no evidence that this provision has actually ever been enforced, and the Antioch Library has consistently allowed its meeting room to be used a classroom. *See* Chandler Decl. at ¶ 123.

e.     *The Antioch Library has not consistently enforced its meeting room use policies.*

Finally, the Ninth Circuit emphasized the lack of evidence showing that the Library had not consistently applied its policy restrictions. *Faith Center*, 480 F.3d at 909. But the full record reveals otherwise. In addition to the school-related uses mentioned in the previous section, the Antioch Library has often allowed groups to violate its rules prohibiting use of the meeting room more than once a week or more than eight hours at a time. *See* Chandler Decl. at ¶¶ 120-21.The County's Meeting Room Policy also requires that applicants "must fully complete an application form for each use," *see* Ex. T to Chandler Decl., but the Library has approved applications that are only partially completed. *See* Chandler Decl. at ¶ 122.

Nor has the Antioch Library consistently enforced its Religious Use Policy. Around the time that Faith Center was denied access to the forum, the Library allowed several other groups to conduct religious meetings in its meeting room, including the Ahmadiyya Muslim Community, the Know Thyself as Soul Foundation, Alcoholics Anonymous, and Narcotics Anonymous. *See id.* at ¶¶ 25-34.[12] In fact, the same librarian who enforced the Meeting Room Policy against Faith Center acknowledged that she attended Narcotics Anonymous meetings at

---

[12] The Library permitted these groups to use its meeting room when the Meeting Room Policy prohibited all "religious services and activities" or meetings conducted with "religious purposes." *See* Exs. C and E to Compl.

the Antioch Library, which she said were "definitely" religious meetings. Ex. F to Chandler Decl., at 20-22. But she never enforced the Policy against Narcotics Anonymous. *Id.* at 27-28.

In short, the County's policy and practices make clear that the County intended for the Antioch Library meeting room to be "generally open" to the entire community for expressive purposes. As such, it is a designated public forum.

**2.    *The nature of the forum is compatible with a wide array of expression.***

When classifying a forum, courts also look at whether "expressive activity is consistent with the nature of the forum." *Hopper*, 241 F.3d at 1078 (citation omitted). Here, the size and location of the meeting room and its wide range of uses quickly dispels any notion that it is similar to the hushed calm of the Library's reading room and book stacks.[13] The meeting room is quite large, with a capacity of 110 people. *See* Ex. W to Chandler Decl. It sits in the corner of the building opposite from the Library's book stacks and reading area, and is buffered by the lobby and the librarians' private work area, kitchen, and restroom. *See* Ex. R to Chandler Decl. Users enter the meeting room through the lobby, away from the main reading room. Thus, the room is set up to accommodate a wide variety of uses, even while the Library is open, without disturbing other patrons.

The County Librarian has herself dispelled the notion that libraries should be limited to reading, writing, and quiet contemplation: "Some people still think of a library as just a place for books. But, more and more people understand that today's libraries have become the community's living room." *See* Ex. X to Chandler Decl. This is especially true of the Antioch Library meeting room. The Library has approved a broad array of events that go far beyond reading and writing. It has approved, for example, a group to conduct auditions for "American Idol." *See* Chandler Decl. at ¶ 69; Ex. B to Chandler Decl., at 9. It also allowed a production company to conduct auditions for a gospel play (which included singing and amplified music) and conduct rehearsals in the meeting room. *Id.* at ¶ 71. And it has allowed the meeting room to be used to conduct elections, show movies, hold speech contests, host youth sports sign-ups, and

---

[13] The Ninth Circuit noted that the principle function of a library is to "aid in the acquisition of knowledge through reading, writing, and quiet contemplation," *id.* at 910 (quotation marks and citation omitted), and imputed this function to the meeting room. But the Antioch Library's consistent practices reveal that its meeting room serves a much broader function.

put on award ceremonies. *Id.* at ¶¶ 23, 72, 79, 85, and 93.

The Library has also conducted its own events that show that its meeting room is "the community's living room." It sponsored a hot dog and ice cream social for kids, it has brought in performing clowns and singers, and it has sponsored presentations involving live animals, such as pigs. *See* Ex. F to Chandler Decl., at 9; Ex. D to Chandler Decl., at 9; Chandler Decl., Ex. V.

The Ninth Circuit's analysis stressed that the meeting room "is available only during the Library's operating hours when other library patrons are present." *Faith Center*, 480 F.3d at 916; *see also id.* at 902, 910. But this is not true. There is no restriction on how early in the morning the meeting room can be used, and it is available until 10:00 p.m. every day. *See* Ex. B to Chandler Decl., at 18. So it is actually available for more hours when the Library is closed than when it is open.[14] And when the Library is closed and the staff is not working, the Library does not impose any sound restrictions on meeting room use, severely undermining any claim that the meeting room is only intended to function as a venue for reading, writing, and quiet contemplation. *See* Ex. B to Chandler Decl., at 19-20.

**E.     The Religious Use Policy cannot survive strict scrutiny.**

Strict scrutiny is an "exacting test," requiring the government to prove that its restriction is narrowly tailored to a compelling interest. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 620, 680 (1994) (O'Connor, J., concurring). "It is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy. There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal." *Id.*

The County has offered only one interest which it claims is sufficiently compelling to justify its discriminatory policy: complying with the Establishment Clause.[15] But, as this Court

---

[14] The Antioch Library is open from 10 a.m. to 8 p.m. on Monday through Wednesday, 12 p.m. to 8 p.m. on Thursday, 12 p.m. to 6 p.m. on Friday, 10 a.m. to 6 p.m. on Saturday, and is closed on Sunday. Ex. U to Chandler Decl. The meeting room has been used as early as 6:30 a.m. Chandler Decl. at ¶ 85. Even limiting its availability to 6:30 a.m. until 10:00 p.m., the meeting room is available for 108.5 hours a week, and the Library is only open for 52 hours a week.

[15] Although the Supreme Court has noted that an interest in complying with the Establishment Clause "'may be characterized as compelling,' and therefore may justify content-based

has already held, "[t]he Supreme Court has foreclosed this argument by consistently holding that a policy of equal access does not violate the Establishment Clause." *Faith Center Church Evangelistic Ministries v. Glover*, 2005 WL 1220947 (N.D. Cal. 2005) (listing cases). Nor does the County have any other plausible interest that could justify its Policy or its application to Faith Center in this instance. Thus, the policy cannot survive strict scrutiny.

**III.   The County cannot limit access to a forum in a manner that violates the Free Exercise Clause.**

Just as the County's power to limit access to its meeting rooms is constrained by the Free Speech Clause, it is also constrained by the Free Exercise Clause. The government may only burden religious exercise through rationally-based, neutral regulations of general applicability. *Employment Div., Dept. of Human Resources of Or. v. Smith*, 494 U.S. 872, 879 (1990). A regulation that is not neutral or generally applicable violates the Free Exercise Clause unless the government can prove that it is narrowly tailored to advance a compelling interest. *Church of the Lukumi*, 508 U.S. at 533.

"A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and it if does not 'in a selective manner impose burdens only on conduct motivated by religious belief.'" *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (quoting *Church of the Lukumi*, 508 U.S. at 533, 543). The County fails this standard by selectively excluding "pure religious worship" from its otherwise open forum.

Pastor Hopkins's religious beliefs motivate her to conduct religious meetings in places other than traditional church buildings. Compl. at ¶¶ 23-24. But the County prohibits her meetings precisely because they are religiously-motivated, while allowing the exact same speech and conduct if done for non-religious reasons. For example, the Antioch Library has approved groups to hold singing auditions in the meeting room. *See* Chandler Decl. at ¶ 71. So someone could sing "Amazing Grace" to try out for a part in a play. But the County forbids Faith Center from singing the same song in its meetings. *See* Hopkins Decl. at ¶ 13. Similarly, the Library permits patrons to bring food

discrimination. . . . it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination," as is occurring here. *Good News Club*, 533 U.S. at 112-13 (quoting *Widmar*, 454 U.S. at 271).

and drinks into the meeting room. *See* Ex. W to Chandler Decl. So one can consume food or drinks as refreshments; but is prohibited from doing so if done for religious reasons, such as taking communion or celebrating a Seder.

Courts have consistently invalidated regulations that are targeted at conduct solely because it is religiously-motivated. *See, e.g., Church of the Lukumi*, 508 U.S. at 536-37 (striking down law that prohibited killing animals for religious ceremonies but allowed killing animals for food or recreational hunting); *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (explaining that the Free Exercise Clause prohibits the government from "deciding that secular motivations are more important than religious motivations," and striking down a police regulation that allowed officers to wear beards for medical reasons but not for religious reasons).

In a particularly analogous case, the Fourth Circuit struck down a school board policy that allowed community groups to rent school facilities, but charged religious groups an escalating rental fee that other non-profit groups did not have to pay. *Fairfax Covenant Church v. Fairfax County Sch. Bd.*, 17 F.3d 703, 705 (4th Cir. 1994). Charging a church more to access a public forum, the court held, "interferes with or burdens the Church's right to speak and practice religion protected by the Free Exercise Clause." *Id.* at 707. And the burden here is even greater, as Faith Center's "praise and worship" sessions are wholly excluded from the forum.

In sum, the only way for the County to determine if it will allow certain conduct under its Religious Use Policy is to look at the motivation behind it. The Policy bans certain religious practices, while allowing the same conduct if it is not religiously-motivated. This is no different than if the County allowed patrons to wear hats but prohibited Jewish men from wearing yarmulkes or Muslim women from wearing head scarves. Such "special disabilities on the basis of religious views or religious status" run afoul of the Free Exercise Clause. *Smith*, 494 U.S. at 877.

**IV.    The Religious Use Policy violates the Establishment Clause.**

The Establishment Clause's "clearest command" is that the government must remain neutral in its treatment of religion. *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Religious Use Policy violates this basic principle by (1) demonstrating the County's hostility toward particular religious speech and conduct that it has singled out and excluded from its meeting rooms; and (2) expressly

discriminating among religions based on the manner in which they practice their religion.

**A.      The Religious Use Policy is impermissibly hostile toward religion.**

The Establishment Clause "applies not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility toward religion." *American Family Assn., Inc.*, 277 F.3d at 1120-21 (citations omitted). If "it would be objectionably reasonable for the government action to be construed as sending primarily a message of . . . disapproval of religion," the action is unconstitutional. *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994) (citations omitted). This inquiry is conducted "from the perspective of a 'reasonable observer' who is both informed and reasonable." *American Family Assn.*, 277 F.3d at 1133; *see also Kreisner v. City of San Diego*, 1 F.3d 775, 784 (9th Cir. 1993).

The Ninth Circuit explained in *Kreisner* that the "exclusion of religious groups from a forum otherwise open to all would demonstrate government hostility to religion rather than the neutrality contemplated by the Establishment Clause," which is exactly what the County is doing. *Id.* at 785; *see also Good News Club*, 533 U.S. at 118 ("[W]e cannot say that the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum"). The Religious Use Policy excludes "pure religious worship" from a forum otherwise open to all. Even the most controversial groups, like the KKK and NAMBLA, are free to use the meeting room. *See* Ex. A to Chandler Decl. at 38-39. By effectively saying "Pedophiles and racists are welcome; religious worshippers are not," the reasonable observer would undoubtedly construe the Religious Use Policy as hostile toward religion.

**B.      The Religious Use Policy impermissibly distinguishes among religions.**

The First Amendment guarantees that every religious denomination be equally free to exercise and propagate its beliefs. *See Larson*, 456 U.S. at 245. Thus, when government regulations distinguish between religions, or between religious beliefs or practices, the regulation is subject to strict scrutiny. *Id.* In *Larson*, the Supreme Court struck down a Minnesota law that imposed registration and reporting requirements upon only those religious groups that solicit more than 50% of their funds from non-members. *Id.* at 231-32. Because the law "ma[de] explicit and deliberate

distinctions between different religious organizations," *id.* at 247 n.23, the Court held that it "clearly grant[ed] denominational preferences of the sort consistently and firmly deprecated in [the Supreme Court's] precedents." *Id.* at 246.

Similarly, the Tenth Circuit recently struck down a Colorado statute prohibiting use of state scholarship money at "pervasively sectarian" schools. *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008). By distinguishing between "sectarian" and "pervasively sectarian" schools, the state was unconstitutionally discriminating "on the basis of the nature of the religious practice these institutions are moved to engage in." *Id.* at 1259. This law was even more problematic than the one in *Larson*, the court explained, because it was not framed in secular terms. *Id.*

The Religious Use Policy is no different. It determines eligibility for a government benefit—access to a forum—on the basis of the nature of the religious practice that a group engages in. The County bars religious denominations that engage in "pure religious worship," but welcomes all other religious groups. *See Faith Center*, 480 F.3d at 901 (Bybee, J., dissenting from denial of rehearing en banc) (noting that a ban on "pure religious worship" unconstitutionally discriminates between theistic and non-theistic religions because the latter do not worship any divine being). And, like the Colorado statute, the Religious Use Policy is especially problematic because it is framed in explicitly religious terms. It therefore fails the neutrality standard commanded by the Establishment Clause.

## V.    The Religious Use Policy violates Faith Center's right to equal protection.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Serrano v. Francis*, 345 F.3d 1071, 1081 (9th Cir. 2003) (quotation marks and citation omitted). Faith Center falls within the broad class of speakers that may use the Antioch Library meeting room, but is treated differently solely because its speech and activities are religiously-motivated.

Government classifications that "employ[] a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right" are subject to strict scrutiny. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) (citation omitted). The Religious Use

Policy does both.[16] It burdens Faith Center's freedom of speech and free exercise of religion (*see* Sections II-III, *supra*) by targeting religiously-motivated expression for a unique disability.

It also discriminates on the basis of religion, a suspect class, by distinguishing between the types of religious meetings allowed in the Antioch Library meeting room. In *Fowler v. Rhode Island*, the Supreme Court struck down a city ordinance that had been construed in a manner that prohibited Jehovah's Witnesses from conducting a religious service in a public park, but allowed other religious sects to hold services there. 345 U.S. 67, 69 (1953). This "amount[ed] to the state preferring some religious groups over this one," which is barred by the Fourteenth Amendment. *Id.* The Religious Use Policy similarly prefers only those religious groups whose adherents do not engage in "pure religious worship." As such, it violates the Equal Protection Clause.

## CONCLUSION

This case exemplifies the pitfalls, both logically and constitutionally, that inevitably emerge whenever the government tries to compartmentalize "religious services" and exclude them from a forum otherwise open to all. The result is both non-sensical and unconstitutional: seminars giving financial advice are in, but sermons giving financial advice are out; hot dogs and ice cream are in, but communion wafers are out; pedophiles and racists are in, but churches and synagogues are out. The Constitution prohibits these types of irrational and discriminatory policies that impose unique burdens on religious speech and exercise. Summary judgment should therefore be granted in Faith Center's favor.


Dated: September 8, 2008                    ALLIANCE DEFENSE FUND


                                            By:    /s/*Timothy D. Chandler*
                                                   TIMOTHY D. CHANDLER
                                                   Attorney for Plaintiffs

---

[16] Equal protection claims generally require a showing of discriminatory intent. But when a challenged regulation explicitly discriminates based on a suspect class or implicates a fundamental right discriminatory intent is presumed. *See Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) (classifications that impinge upon fundamental rights are "presumptively invidious"); *Faulkner v. Jones*, 51 F.3d 440, 444 (4th Cir. 1995) ("[D]iscriminatory intent need not be established independently when the classification [based on a suspect class] is explicit").