**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAITH CENTER CHURCH EVANGELISTIC MINISTRIES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL D. GLOVER, et al., <br><br> Defendants. | No. C 04-03111 JSW <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND ORDER GRANTING INJUNCTIVE RELIEF** |

Now before the Court for consideration are the Motion for Summary Judgment filed by Plaintiffs, Faith Center Church Evangelistic Ministries and Dr. Hattie Mae Hopkins (collectively "Faith Center"), and the Cross-Motion for Summary Judgment filed by Defendants, Federal D. Glover, Mark DeSaulnier, John M. Gioia, Millie Greenberg, Gail Uilkema, John Sweeten, Anne Cain, Patty Chan, and Laura O'Donoghue (collectively "the County," unless otherwise noted).

## BACKGROUND

**A.  Procedural History.**

On July 30, 2004, Faith Center filed this suit challenging the County's Policy for the Use of Meeting Rooms in Libraries (the "Amended Policy"), which prohibits the use of library meeting rooms for "religious services." Faith Center alleges that this prohibition violates its

rights under the Free Speech, Free Exercise, and Establishment clauses of the First Amendment to the United States Constitution and violates its rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (Amended Verified Complaint ("Am. Compl."), ¶¶ 86-114.) On a limited factual record, this Court granted Faith Center's motion for a preliminary injunction and enjoined the County from enforcing the prohibition against religious services. (*See* Docket No. 52.) The County appealed, and the Ninth Circuit reversed in part, vacated in part, and remanded for further proceedings. *Faith Center Evangelistic Ministries v. Glover*, 480 F.3d 891, 919 (9th Cir. 2007).

This case requires the Court "to navigate between two equally important interests: [Faith Center's] right to access a government building that is open to other groups, and the [County's] right to preserve its property for its intended uses." *Id.* at 902. Having considered the parties' papers, the record in this case, and relevant legal authority and having had the benefit of oral argument, the Court HEREBY GRANTS IN PART AND DENIES IN PART Faith Center's motion for summary judgment and HEREBY GRANTS IN PART AND DENIES IN PART the County's cross-motion for summary judgment.

**B.      Factual Background.[1]**

    **1.      The Parties.**

Dr. Hopkins is the leader of Faith Center, a non-profit religious corporation. (Am. Compl., ¶¶ 10-11; Declaration of Dr. Hattie M. Hopkins in Support of Plaintiffs' Motion for Summary Judgment ("Hopkins Decl."), ¶ 1.) The named defendants are current and former members of the Contra Costa County Board of Supervisors (defendants Glover, DeSaulnier, Gioia, Greenberg, and Uilkema), the former Contra Costa County Administrator (Sweeten), the Contra Costa County Librarian (Cain), the Senior Branch Librarian of the Antioch Branch Library (Chan), and the Administrative Deputy Director of the Antioch Branch Library (O'Donoghue). (*Id.*, ¶¶ 12-20.)[2]

---

[1]      Unless otherwise noted, the facts are undisputed.

[2]      Defendants DeSaulnier and Greenberg are no longer on the Board of Supervisors.

2

**2. The Amended Policy.**

On December 14, 2004, the County passed a resolution, which provides that "[i]t is the policy of the Contra Costa Library to encourage the use of library meeting rooms for educational, cultural, and community related meetings, programs, and activities." (Docket No. 30 (Declaration of Anne Cain in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Cain Decl. I"), Ex. A (Amended Policy).)[3] "All groups request[ing] use of library meeting room must fully complete an application form for each use." (*Id.*) The Library has, on occasion, approved an application that is not complete. (Declaration of Timothy Chandler in Support of Plaintiffs' Motion for Summary Judgment ("Chandler Decl."), ¶ 121, Ex. P.) However, there is no evidence that the Library has permitted access to a meeting room without first approving an application. The Amended Policy also provides that "[l]ibrary meeting rooms are available to schools only for special meetings, programs, or activities. They may not be used for instructional purposes as a regular part of the curriculum" (the "Educational Use restriction"). (Cain Decl. I, Ex. A.) In addition, "[l]ibrary meeting rooms shall not be used for religious services" (the "Religious Use restriction"). (*Id.*) The Library has enforced these restrictions consistently.

**3. The Library and the Meeting Room.**

The Library is open to the public Monday-Wednesday from 10:00 a.m. to 8:00 p.m., Thursday from 12:00 p.m. to 8:00 p.m., Friday from 12:00 p.m. to 6:00 p.m., and Saturday from 10:00 a.m. to 6:00 p.m. (Chandler Decl., Ex. U.) It is closed on Sunday. An applicant may use the Meeting Room any day of the week at any time before the Library opens and after the Library closes, until 10:00 p.m. (*Id.*, ¶¶ 120-121, Ex. W.) The Meeting Room is 900 square feet, accommodates 110 people, is not sound-proofed, and is located off of the Library lobby near offices and a general work area for Library staff. (Chandler Decl., Ex. W; Cain Decl. I, ¶ 5; Declaration of Anne Cain in Support of Defendants' Cross-Motion for Summary Judgment ("Cain Decl. II"), ¶ 5, Ex. A.)

---

[3] The County amended the policy twice during this action. The prior versions of the Amended Policy precluded, respectively, the use of library meeting rooms for "religious purposes" and "religious services or activities." (Am. Compl., Exs. C, E.)

United States District Court
For the Northern District of California

The Library has approved over 1200 applications from approximately 121 organizations seeking to use the Meeting Room for various purposes, including but not limited to: (a) the Sierra Club for letter writing and a conservation discussion; (b) the Gay, Lesbian and Straight Education Network to train the Antioch Gay Straight Alliance; (c) the Glorious Communication Network for purposes of a Bible study and to build people of integrity; (d) meetings of Alcoholics and Narcotics Anonymous; (e) College Consultant Service to prepare for tests; (f) Merrill Lynch for a free investor training meeting; (g) the Contra Costa County Bar Association for free immigration legal services; (h) Hanna & Brophy (on a fee based basis) to conduct depositions; (i) K/P Entertainment to conduct auditions for American Idol[4]; (j) Order My Life Productions to conduct play rehearsals for gospel stage plays; (k) Boy Scouts and Cub Scouts meetings; (l) the California Department of Rehabilitation for a team building meeting; and (m) SEIU UHW-West for membership meetings. (Chandler Decl., ¶¶ 10-118.) The Library also has allowed another church to use the Meeting Room on Sundays to teach people to read using the Bible. (Galindo Depo. at 12:15-14:19.) Finally, the Library held a hot dog and ice cream party in the meeting room to celebrate National Hot Dog Month and National Ice Cream Month and has held events at which live animals were brought into the Meeting Room. (Chandler Decl., Exs., L, V; Biglow Depo. at 8:8-9:7.)[5]

### 4. Faith Center's Requests to Use the Meeting Room.

Dr. Hopkins believes that she is called to share her faith with others. (Hopkins Decl., ¶ 2.) Dr. Hopkins also believes "that there are many individuals who would benefit from learning about Christianity and the Bible, but who may be unwilling to set foot inside a church building. So [she holds] Faith Center's meetings in buildings other than traditional church buildings." (*Id.*, ¶ 3; *see also* Am. Compl. ¶¶ 21-24.) At these meetings, participants "discuss

---

[4] K&P cancelled this event. (Chandler Decl., Ex. B (Deposition of Greta Galindo ("Galindo Depo.") at 9:1-10:4 & Galindo Depo. Ex. 10)).

[5] The Ninth Circuit refrained "from commenting on the permissibility of singing, eating, and drinking" in the Meeting Room, because the record at that time did not contain the rules and regulations regarding use of the Meeting Room. *Faith Center*, 480 F.3d at 914 n.13. It now is undisputed that groups may engage in these activities in the Meeting Room.

4

educational, cultural, and community issues from a religious perspective; ... engage in religious speech *and* religious worship; and ... engage in discussing the Bible and other religious books, teaching, praying, singing, sharing testimonies, sharing meals, and discussing social and political issues." (Am. Compl., ¶ 26 (emphasis added); *see also* Hopkins Decl., ¶ 4.)

In May 2004, Dr. Hopkins applied to use the Meeting Room for two meetings to be held on May 29 and July 31, 2004. (Am. Compl., ¶¶ 28-29, 36, 39-41 & Exs. A, B.) Dr. Hopkins identified herself as a "Pastor" and stated that Faith Center wanted to use the Meeting Room for "prayer, praise and worship open to public, purpose to teach and encourage salvation through Jesus Christ and build up community." (*Id.*, Exs. A, B.) Faith Center held the meeting scheduled for May 29, which was entitled "Women of Excellence Conference." The Conference was divided into four parts: (1) registration; (2) a Wordshop, entitled "The Making of an Intercessor," which Faith Center described as "an Endtime call to Prayer for every Believer, and how to pray fervent, effectual Prayers that God hears and answers;" (3) refreshments; and (4) Praise and Worship, with a sermon by Dr. Hopkins entitled "Position Yourselves for Victory." (Hopkins Decl., ¶¶ 8-9; Docket No. 31 (Declaration of Danielle Merida in Opposition to Plaintiff's Motion for Preliminary Injunction, Ex. A).)

According to Dr. Hopkins, when she uses the phrase "praise and worship," the term includes "discussions about the Bible, teaching, sermons, singing, praying, sharing testimonies, taking communion and other similar activities." (Hopkins Decl., ¶ 4.) Dr. Hopkins also attests that "'praise and worship' involves teaching about who God is and helping us to develop our moral character so that it is consistent with what the Bible teaches. Specifically, I try to emphasize Biblical directives about moral character, like loving God and our neighbors, helping the weak and poor among us, and leading productive lives as responsible citizens." (*Id.*) She explained that the "Praise and Worship" portion of the May 29 meeting consisted of opening and closing prayers, which were designed, in part, to help "provide "a model to those attending the conference [of] what the Wordshop taught about effectively communicating with God" and to acknowledge "personal and community struggles that were affecting those in attendance and ask[ed] for God to show us how to remove those struggles and heal the community." (*Id.*, ¶ 10.)

5

1	Faith Center also sang two songs during the afternoon session, *When I See Jesus* and
2	*Amazing Grace*. (*Id.*, ¶¶ 11-14.) Dr. Hopkins then gave her sermon, which "was designed to
3	reinforce what was taught during the morning Wordshop." (*Id.*, ¶¶ 15-17.) Dr. Hopkins attests
4	that, in general, her "sermons cover topics like: developing strong character; developing good
5	self-esteem by understanding how God sees us; overcoming addictions and harmful habits;
6	learning to forgive; knowing how to have a good relationship with God and others; having
7	patience; learning to rely on God to provide for all of our needs; learning how to deal with
8	rejection; and overcoming fear, anxiety and depression." (*Id.,* ¶ 5.)

9	At some point during the meeting, Library personnel advised Faith Center that the
10	meeting violated the Religious Use restriction then in force and advised Faith Center that it
11	could not hold its July 31 event in the Meeting Room. (Am. Compl. ¶ 52; Hopkins Decl. ¶ 19;
12	Loomis Depo. at 14:18-17:11; Biglow Depo. at 10:3-11:21, 13:17-17:18.) After the Court
13	granted the motion for a preliminary injunction, Faith Center held several events in the Meeting
14	Room. (Hopkins Decl., ¶ 20.) In November 2007, after the Ninth Circuit's ruling, Faith Center
15	submitted another application to use the Meeting Room on December 15, 2007 from 5:30-9:00
16	p.m. for "Prayer, Praise Wordshop Purpose to Teach Scripture and Encourage Salvation thru
17	Jesus to Build-Up this Community Overall." (Cain Decl. II, ¶ 11, Ex. B.) Ms. Cain approved
18	the application and advised Faith Center that it could use the Meeting Room "for any activity
19	that does not violate the meeting room use policy including activities that express a religious
20	viewpoint. In accordance with the Ninth Circuit's holding, you are responsible for
21	distinguishing religious worship services from other forms of religious speech." (*Id.*, ¶ 12, Ex.
22	C.)

23	Dr. Hopkins attests that "it is impossible for [her] to distinguish between worship and
24	any other aspect of Faith Center's meetings," because she understands "worship to be an
25	outward expression of a relationship with God," and "any time [she is] doing something that is
26	in accordance with what God would like [her] to do, that is an act of worship." (Hopkins Decl.,
27	¶¶ 6-7.) Dr. Hopkins would like to use the Library meeting room for further Faith Center
28	meetings to be held on Saturday evenings starting at 6:00 p.m. (*Id.*, ¶¶ 22-23.)

6

# ANALYSIS

**A.     Standards Applicable to Motions for Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material," if the fact may affect the outcome of the case. *Id*. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must demonstrate affirmatively that no reasonable trier of fact could find other than for the moving party. *Id*.; *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the non-moving party meets its initial burden, the party opposing summary judgment must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Further, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th 1996) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

//

//

**B. The Religious Use Restriction Does Not Violate the Free Speech Clause.**

"Congress shall make no law ... abridging the freedom of speech ...." U.S. Const. amend. I.[6] In order to determine whether the Religious Use restriction violates Faith Center's First Amendment right to freedom of speech, the Court makes three inquiries. It must first determine if the speech in question is in fact protected by the First Amendment. *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797 (1985). If the speech is not protected, the inquiry ends. *See Faith Center*, 480 F.3d at 906. If, however, the speech is protected, the second step in the analysis is to identify the nature of forum in which the speech is regulated. *Cornelius*, 473 U.S. at 797. The third step is to assess whether the County's justification for excluding Faith Center from the relevant forum satisfies the requisite standard. *Id.* Viewpoint discrimination is never permissible, even in a non-public forum. *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 394 (1993) (*citing Cornelius*, 473 U.S. at 806).

**1. Faith Center engaged in protected speech.**

It is undisputed that Faith Center's expressive activities are protected by the First Amendment, whether they constitute "mere worship" or something more. *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 111-12 (2001); *Lamb's Chapel*, 508 U.S. at 394-95; *Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *Faith Center*, 480 F.3d at 906-07.

//

//

---

[6] The County asserts that the Ninth Circuit's ruling is the law of the case on Faith Center's free speech claim and asserts it is entitled to judgment in its favor on that basis. "The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir.1993) (internal quotations and citations omitted). However, in the context of a preliminary injunction appeal, a "district court should abide by 'the general rule' that our decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattleman Action Legal Fund United Stockgrowers of America v. U.S.D.A.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (quoting *Southern Oregon Barter Fair v. Jackson Co.*, 372 F.3d 1128, 1136 (9th Cir. 2004)). The Ninth Circuit's conclusions on pure issues of law, however, are binding. *Ranchers Cattleman*, 499 F.3d at 1114. In this case, the Ninth Circuit's legal conclusions were premised upon a "limited evidentiary record." *Faith Center*, 480 F.3d at 918 n.18. Upon remand the parties engaged in discovery. Accordingly, the Court concludes that it is appropriate to follow the general rule of *Ranchers Cattleman*, and it will evaluate Faith Center's claims on the current evidentiary record. *See Southern Oregon*, 372 F.3d at 1136.

### 2. The Meeting Room is a limited public forum.

The Ninth Circuit concluded that the Meeting Room is a limited public forum. *Faith Center*, 480 F.3d at 908-10. Faith Center argues that the evidence now shows the County created a designated public forum. To determine the nature of the forum, the Court looks to such factors as "'the policy and practice of the government, the nature of the property and its compatibility with expressive activity, and whether the forum was designed and dedicated to expressive activity.'" *Faith Center*, 480 F.3d at 908 (quoting *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir. 1988)); *see also Cornelius*, 473 U.S. at 802-03.

"Non profit and civic organizations, for-profit organizations, schools, and governmental organizations" are entitled to use the Meeting Room, for "meetings, programs, or activities of educational, cultural, or community interest[.]" (Cain Decl. I, Ex. A.) This language demonstrates that the "County's purpose was to invite the community at large to participate in use of the meeting room for expressive activity." *Faith Center*, 480 F.3d at 909 (noting that although the County drafted the Amended Policy broadly, that fact did not necessarily lead to the conclusion that the County created a designated public forum). The expanded evidentiary record shows that, in practice, the County allows a wide variety of groups and organizations to use the Meeting Room for varied purposes, including meetings, seminars, auditions for plays, graduation ceremonies, and rehearsals. (*See generally* Chandler Decl., ¶¶ 10-118.) This evidence also evidences the County's intent to open the Meeting Room to the community at large so that it might engage in expressive activity. *Faith Center*, 480 F.3d at 909.

The Ninth Circuit also found that the Educational Use and Religious Use restrictions and the application and approval process demonstrated that the County did not open the Meeting Room to "indiscriminate use." *Id.* Although Faith Center argues that the County has not consistently applied the Educational Use restriction, the evidence does not support that conclusion. (Chandler Decl., ¶¶ 34-50.) Thus, the fact that the County applies the Amended Policy consistently further supports the conclusion that the Meeting Room is a limited public forum. *See Faith Center*, 480 F.3d at 909; *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th

9

1  Cir. 2001) ("[C]onsistency in application is the hallmark of any policy designed to preserve the
2  non-public status of a forum.").[7]

3  Finally, the Court considers the nature of the forum. The Meeting Room is located
4  within a library, which "is quintessentially 'a place dedicated to quiet, to knowledge, and to
5  beauty,' ... where 'the worthy missions of facilitating learning an cultural enrichment' are
6  fostered, ... and whose 'very purpose is to aid in the acquisition of knowledge through reading,
7  writing, and quiet contemplation.'" *Faith Center*, 480 F.3d at 909-10 (quoting *Brown v.
8  Louisiana*, 383 U.S. 131, 142 (1966), *United States v. Am. Library Ass'n*, 539 U.S. 194, 203
9  (2003), and *Kreimer v. Bureau of Police for Town of Morrison*, 958 F.2d 1242, 1261 (3rd Cir.
10 1992)). According to the Ninth Circuit, this fact and the fact that the Meeting Room is
11 accessible during normal operating hours demonstrated that the forum "is compatible with
12 different kinds of expressive activities such as a group discussion or lecture," and that opening
13 the Meeting Room"was not intended to undermine the library's primary function as a venue for
14 reading, writing and quiet contemplation." *Id.* at 910.

15 The expanded record demonstrates, however, that the Library permits the meeting room
16 to be used not only for group discussions or lectures but also for mixers, play rehearsals,
17 auditions, and tryouts for American Idol, some of which take place during normal operating
18 hours. The Library also has allowed live animals into the Meeting Room. (*See, e.g.,* Chandler
19 Decl., ¶¶ 69, 71, Ex. L; Biglow Depo. at 8:8-9:7.) Further, applicants may reserve the Meeting
20 Room both before the Library opens and after it has closed. (Chandler Decl., ¶ 126, Ex. U.)
21 Thus, the County has opened the Meeting Room to a broader range of events than lectures and
22 group discussions. *See, e.g., Faith Center*, 480 F.3d at 910. However, the County's decision to
23 screen applications prior to approval, its consistent enforcement of the Educational Use and
24 Religious Use limitations, and the fact that the Meeting Room is located within a library, lead

---

[7] Faith Center notes that the Library rules also state that an organization can use the room once per week within one fiscal year and that the duration of use is limited to eight (8) hours per day. Although the Library has not enforced these particular rules on a consistent basis, the Court finds those facts to be immaterial, because the appropriate focus is on whether it enforced the Amended Policy consistently.

10

1  the Court to conclude that the expanded evidentiary record does not alter the Ninth Circuit's

2  holding that the Meeting Room is a limited public forum. *See Faith Center*, 480 F.3d at 910.

### 3. The Religious Use restriction is reasonable in light of the purposes of the forum.

In order to determine whether the Religious Use restriction is reasonable, the Court focuses on whether "'the limitation is consistent with preserving the property for the purpose to which it is dedicated.'" *Faith Center*, 480 F.3d at 910 (quoting *DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958, 967 (9th Cir. 1999)). The Court also may consider the fact that the Meeting Room is located in a library in this analysis. *Id.*; *see also Hopper*, 241 F.3d at 1078 (noting that when determining whether expressive activity "is consistent with principal function of the forum, ... [court] focuses on specific space to which the would-be speaker seeks access, but should also take into account the context of the property as a whole").

The County "regulates the use of the meeting room to preserve the character of the forum as a common meeting space, an alternative to the community lecture hall, the corporate board room, or the local Starbucks." *Faith Center*, 480 F.3d at 910. Thus, Amended Policy prevents the Meeting Room from being transformed "from a community meeting room to a public school ... or an occasional house of worship." *Id.* In practice, the County has opened the Meeting Room to groups that have used it for purposes that would not be conducive to maintaining a sanctuary for reading, writing, and quiet contemplation. (*See, e.g.,* Chandler Decl., ¶¶ 69, 71, Ex. L; Biglow Depo. at 8:8-9:7.) However, those activities do not undermine the Library's purpose of opening the Meeting Room as a venue available to the community as a whole and do not transform the Meeting Room into a school or an occasional house of worship.

The Ninth Circuit also relied on the fact that the Meeting Room "is available only during the Library's operating hours," *id.* at 916, but the Meeting Room is available for use when the Library is not open to the public. (Chandler Decl., ¶¶ 126, 128, Exs. U, W.) In light of the Ninth Circuit's determination that the County did not intend "for the [Meeting Room] to be open for indiscriminate use," the Court concludes that this fact does not render the Religious Use restriction unreasonable. Therefore, the Court concludes that expanded record does not

1 alter the Ninth Circuit's holding that the Religious Use restriction is reasonable in light of the
2 purposes of the forum.

### 4. The Religious Use restriction is viewpoint neutral.

In order to determine whether the government has engaged in content or viewpoint discrimination, the Court examines whether the "government has excluded perspectives on a subject matter otherwise permitted by the forum." *Faith Center*, 480 F.3d at 912. The Ninth Circuit held that "[p]ure religious worship ... is not a secular activity that conveys a religious viewpoint on otherwise permissible subject matter." *Id.* at 915 (and noting that worship "is not a viewpoint but a category of discussion within which many different religious perspectives abound"). Thus, "a blanket exclusion of religious worship services is one based on the content of speech." *Id.*

The County concedes that applying the Religious Use restriction to exclude the activities in which Faith Center engaged during its morning session would violate Faith Center's free speech rights. *See id.* at 914. Therefore, although the County can exclude religious services from the Meeting Room, it "may not exclude proselytizing speech ... if that speech helps convey a viewpoint about an otherwise appropriate topic." *Faith Center*, 480 F.3d at 918. When the Ninth Circuit concluded that "Faith Center admits that it occupied the [Meeting Room] in the afternoon of May 29, 2004 expressly for 'praise and worship,'" it relied only on Faith Center's applications to use the Meeting Room and a flyer. *Faith Center*, 480 F.3d at 918. In support of its motion, and in an effort to overcome the Ninth Circuit's determination that it "can and did" identify whether it had engaged in pure religious worship, Faith Center submits Dr. Hopkins' declaration.[8]

As set forth above, Dr. Hopkins explains that the afternoon session consisted of two prayers, two songs, and a sermon. It is undisputed that the Library permits singing in the Meeting Room. Dr. Hopkins also contends that the prayers served the purpose, *inter alia*, of

---

[8] Faith Center also made this distinction in the FAC, when it noted that Faith Center participants "engage in religious speech and religious worship...." (FAC ¶ 26.b.) Faith Center chose to filed a verified FAC and, therefore, swore under penalty of perjury that the facts alleged therein were true.

12

acknowledging personal and community struggles and to ask God for assistance in overcoming those struggles. (Hopkins Decl., ¶¶ 10-17.) The County has allowed meetings of Alcoholics Anonymous and Narcotics Anonymous in the Meeting Room, and the record demonstrates that these organizations engage in similar activities. (*See* Chandler Decl., ¶¶ 30-32, Exs. J, K.) Although this Court is at a loss to say why these activities do not constitute "'elements of worship' that further secular goals," or why they do not constitute "proselytizing speech [that] ... helps to convey a viewpoint about an otherwise appropriate topic," it is bound by the Ninth Circuit's conclusions (1) that the Court is not competent distinguish between pure worship activities and otherwise protected religious speech and (2) that Faith Center admitted that the afternoon session consisted "entirely of praise and worship." *Faith Center*, 480 F.3d at 916-918. Therefore, the Court concludes that the County did not engage in viewpoint discrimination, and the Court grants, in part, the County's motion on this basis.

**C.    As Drafted, the Religious Use Restriction Violates the Establishment Clause.[9]**

Plaintiffs argue that the Religious Use restriction violates the Establishment Clause because it is impermissibly hostile toward religion and impermissibly distinguishes among religions. The County asserts that this is not the case and that, in fact, the Religious Use restriction allows it to permit religious speech in the Meeting Room and, at the same time, maintain neutrality toward religion. The Establishment Clause of the First Amendment to the United States Constitution prohibits any law "respecting an establishment of religion." United States Const. amend. I. "This clause applies not only to official condonement of a particular religion or religious belief, but also to official disapproval or hostility towards religion." *American Family Ass'n, Inc. v. City and County of San Francisco,* 277 F.3d 1114, 1121 (9th Cir. 2002); *see also Catholic League for Religious and Civil Rights v. San Francisco*, 2009 WL 1532200 at *3 (9th Cir. June 9, 2009).

In *Lemon v. Kurtzman,* the Supreme Court articulated the test for analyzing governmental conduct under the under the Establishment Clause. 403 U.S. 602 (1971). To

---

[9]     Because the Court finds in Faith Center's favor on this claim, it does not reach its claims under the Free Exercise Clause or the Equal Protection clause.

13

1  survive the test, the government conduct at issue must (1) have a secular purpose, (2) not
2  advance or inhibit religion as its principal or primary effect, and (3) not foster an excessive
3  government entanglement with religion. *Id.* at 612-13. "Although *Lemon* is most frequently
4  invoked in cases involving alleged governmental preferences to religion, the test also
5  'accommodates the analysis of a claim brought under a hostility to religion theory." *Vasquez v.*
6  *County of Los Angeles*, 487 F.3d 1246, 1255 (9th Cir. 2007) (quoting *American Family Ass'n,*
7  277 F.3d at 1121); *see also Vernon v. City of Los Angeles*, 27 F.3d 1385, 1386 (9th Cir. 1994).
8  Finally, the challenged conduct must survive all three prongs of the *Lemon* test to be
9  constitutional. *Vernon*, 27 F.3d at 1396 (citing *Edwards v. Aguillard*, 482 U.S. 578, 583
10 (1987)).

11       The Court concludes that the Religious Use fails the third prong of *Lemon*, which
12 requires the Court to examine whether the government conduct results in "an excessive
13 government entanglement with religion." *Lemon,* 403 U.S. at 613. "[T]he entanglement prong
14 seeks to minimize the interference of religious authorities with secular affairs and secular
15 authorities in religious affairs." *Cammack v. Waihee,* 932 F.2d 765, 780 (9th Cir.1991). Under
16 this prong, courts ask "whether the involvement is excessive, and whether it is a continuing one
17 calling for official and continuing surveillance leading to an impermissible degree of
18 entanglement." *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 675 (1970); *see*
19 *also Vernon*, 27 F.3d at 1399 ("entanglement typically involves comprehensive, discriminating,
20 and continuing state surveillance of religion"); *Cammack*, 932 F.2d at 781 (finding no excessive
21 entanglement where the government's involvement was not "comprehensive" or "enduring").

22       In *Vernon*, the city of Los Angeles conducted an investigation into whether the
23 plaintiff's religious beliefs were affecting the operations of the police department. The court
24 held that the investigation of the officer did not involve excessive entanglement because there
25 was "no continuing or systematic investigation of religious beliefs .... Given the relatively short
26 duration of the investigation, it [was] unlikely that the government action at issue created either
27 the reality or the appearance of on-going government interference in church affairs." *Id*. at
28 1400. In this case, by contrast, the County has not defined what it means by "religious

14

services." (Chandler Decl., Ex. A (Deposition of Anne Cain ("Cain Depo.") at 35:23-36:6); O'Donoghue Depo. at 10:2-17; Loomis Depo. at 19:13-20:17.) The County contends that the Library relies only on the applications to determine whether an event would fall within the scope of the Religious Use restriction. However, the record demonstrates that if there are questions about whether activities are religious services, rather than other religious activities permitted in the Meeting Room, someone from the County reviews the application to make that determination. (*See, e.g.,* Cain Depo. at 31:24-32:11; Galindo Depo. at 10:14-11:23 & Galindo Depo. Ex. 11; O'Donoghue Depo. at 10:14-11:25; Biglow Depo. at 24:1-26:16.)

Indeed the cited deposition testimony demonstrates the likelihood that the County would be called upon to inquire into religious doctrine in order to determine whether a particular activity qualified as a religious service. That fact distinguishes this case from cases where courts have found that a regulation passes the third prong of the *Lemon* test. *See, e.g., Hernandez v. C.I.R.*, 490 U.S. 690, 696-97 (1989) (rejecting Establishment Clause challenge to a determination that certain payments to Church of Scientology did not qualify as charitable deductions under provisions of Internal Revenue Code and noting that "routine regulatory interaction which involves no inquiries into religious doctrine" does not violate the excessive entanglement prong); *Catholic League*, 2009 WL 1532200 at * 10 (upholding non-binding resolution against Establishment Clause challenge and finding no excessive entanglement because resolution defendants did not take official position on religious doctrine and did not attempt to influence church policy by regulation).

Moreover, in this case, the Ninth Circuit effectively acknowledged the entanglement problem when it stated that to distinguish between "religious worship and virtually all other forms of religious speech," is "challenging." *Faith Center*, 480 F.3d at 918. Echoing the Supreme Court in *Widmar*, the Ninth Circuit determined that the distinction "is one that the government and the courts are not competent to make." *Id.*; *see also Widmar*, 454 U.S. at 270 n. 6 & at 272 n.11 (noting that University "would risk 'greater' entanglement by attempting to enforce its exclusion of 'religious worship' and 'religious speech'" because it would require the University to "determine which words and activities fall within 'religious worship'").

15

1    Accordingly, the Court concludes that the Religious Use restriction fails the third prong
2 of the *Lemon* test, and the Court grants, in part, Faith Center's motion on this basis.

**D.    The Immunity Defenses.**

**1.    Absolute Immunity.**

The County argues that defendants Glover, DeSaulnier, Gioia, Greenberg and Uilkema are absolutely immune from suit, because they approved the Religious Use restriction in their legislative capacity. Faith Center does not dispute this fact. Accordingly, these defendants are entitled to the protections of absolute immunity, and Faith Center cannot recover damages from them. *See Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (noting that "while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself").

**2.    Qualified Immunity.**

The County also argues that defendants Cain, Chan, O'Donoghue and Sweeten ("the Library defendants") are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). The County bears the burden of demonstrating that the Library defendants are entitled to qualified immunity. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1981).

Because the Court has determined that the Religious Use restriction violates the Establishment Clause, the next inquiry is to determine whether the constitutional right was clearly established at the time the alleged conduct occurred. *Saucier*, 533 U.S. at 201; *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994) (citing *Hallstrom v. Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993)). A constitutional right is clearly established for purposes of qualified

16

1 immunity if "[t]he contours of the right [are] sufficiently clear that [at the time the alleged
2 unlawful action is taken] a reasonable official would understand that what he is doing violates
3 that right." *Saucier*, 533 U.S. at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).
4 "This is not to say that an official action is protected by qualified immunity unless the very
5 action in question has previously been held unlawful ...; but it is to say that in the light of pre-
6 existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640. However,
7 government officials are not "charged with predicting the future course of constitutional law."
8 *Ostlund v. Bobb*, 849 F.2d 365, 371 (9th Cir. 1988).

9 A court should then address the question "whether, under that clearly established law, a
10 reasonable [official] could have believed the conduct was lawful." *Id.* This inquiry must be
11 undertaken in the light of the specific context of the case. *Saucier*, 533 U.S. at 194. In deciding
12 whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses on whether
13 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he
14 confronted' ... or whether the state of the law [at the time] gave 'fair warning' to the officials
15 that their conduct was unconstitutional." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002)
16 (quoting *Saucier*, 533 U.S. at 202). Although the inquiry is undertaken in the specific context
17 of the case, the fact that no case has found a constitutional violation under the exact facts
18 alleged does not imply that the law is not clearly established. *Phillips v. Hust*, 477 F.3d 1070,
19 1079-1080 (9th Cir. 2007). When there is no specific, binding precedent on the exact question,
20 the Ninth Circuit looks "to all available decisional law, including the law of other circuits and
21 district courts." *Inouye v. Kemna*, 504 F.3d 705, 714 (9th Cir. 2007).

22 The County offers no legal authority in support of its position that the Library
23 defendants are entitled to qualified immunity, and it does not press the argument in its reply.
24 "This case implicates the difficult intersection of the First Amendment's Free Speech and
25 Establishment Clauses." *Nurre v. Whitehead*, 520 F. Supp. 2d 1222, 1236 (W.D. Wash. 2007).
26 Indeed, based on the County's amendments to the policy during the pendency of this litigation,
27 it seems clear to the Court that it was attempting to navigate its way through that intersection.
28 Thus, while it is clearly established that allowing equal access to a forum will not violate the

17

Establishment Clause[10], and while there is authority to support the proposition that a policy that requires scrutiny into the activities to be conducted in a forum to determine if they are religious services, as is the case here, actually would foster excessive entanglement[11], at the same time, the Ninth Circuit has "recognized that Establishment Clause concerns can justify speech restrictions 'in order to avoid the appearance of government sponsorship of religion.'"[12] Therefore, the Court concludes that the Library defendants are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS IN PART AND DENIES IN PART Faith Center's motion for summary judgment and GRANTS IN PART AND DENIES IN PART, Defendants' cross-motion for summary judgment.

The Ninth Circuit remanded so that this Court could craft an injunction that would allow the County to exclude religious services "and avoid the pitfalls of excessive government entanglement," after it solicited the views of the parties. *Faith Center*, 480 F.3d at 919. Having considered the merits of this case, the Court is faced with a policy that, on its face, results in excessive entanglement. The County suggests that a resolution to this problem is to permit applicants to certify that they will not conduct religious services within the forum. If the County's primary concern is to avoid allowing its Meeting Room to become an "occasional house of worship," allowing the fox to guard the henhouse is not a satisfactory resolution. There may be other permissible means to achieve this goal, but no other options have been presented to the Court. Therefore, the Court concludes that it has no choice but to enjoin the County from enforcing the Religious Use restriction as drafted. In order to give the County

---

[10] *See, e.g., Good News Club*, 533 U.S. at 112-119; *Lamb's Chapel,* 508 U.S. at 394-396; *Widmar,* 454 U.S. 271-275; *accord Prince v. Jacoby*, 303 F.3d 1074, 1092 (9th Cir. 2002) (finding no establishment clause violation by allowing religious group access to forum, even if groups activities included some "devotional exercises").

[11] *See, e.g., Widmar*, 454 U.S. at 272 n.11 ("[T]he University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech.'"); *Gentala v. City of Tuscon*, 325 F. Supp. 2d 1012, 1020-21 (D. Az. 2003).

[12] *Hills v. Scottsdale Unified Sch. Dist.*, 329 F.3d 1044, 1053 (9th Cir. 2003) (quoting *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 983-85 (9th Cir. 2003)).

sufficient time to evaluate and to implement this injunction, the Court FURTHER ORDERS that the injunction shall not take effect until Monday, July 6, 2009.

A separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: June 19, 2009

                                              JEFFREY S. WHITE
                                              UNITED STATES DISTRICT JUDGE